In the Matter of GLAXOSMITHKLINE PLC.

No. A04–2150.

Supreme Court of Minnesota.

June 7, 2007.

Michael A. Lindsay, Dorsey & Whitney, Minneapolis, MN, George S. Cary, Sara D. Schotland, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Appellant.

Mike Hatch, Minnesota Attorney General, Michael J. Vanselow, Paul B. Civello, St. Paul, MN, for Respondent.

Charles R. Shreffler, Mohrman & Kaardal, Minneapolis, MN, Elizabeth B. McCallum, Howrey LLP, Margaret M. Zwisler, Charles H. Samel, Latham & Watkins LLP, Washington, D.C., for Amicus Curiae.

## OPINION

ANDERSON, G. BARRY, Justice.

The Minnesota Attorney General (the state) served a civil investigative demand on GlaxoSmithKline plc (GSK), requesting certain documents. GSK complied but designated many of the documents as confidential, precluding release of those documents to the public. The state filed a motion in Hennepin County District Court challenging the confidentiality designation on some of those documents. The district court denied the state's motion, holding that the disputed documents are protected from disclosure by the Minnesota Government Data Practices Act, the First Amendment, and a confidentiality agreement and protective order agreed to by the parties. The court of appeals reversed on all grounds. We granted GSK's petition for review. We affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

In May 2003 the state served a civil investigative demand (CID) on GSK, a pharmaceutical company. Minnesota Statutes § 8.31, subd. 2 (2006), authorizes the attorney general to issue a CID for purposes of discovery, pursuant to a pending investigation, without commencing a civil action and without leave of the district court. A CID is a statutory discovery tool that assists the state in investigations of suspected violations of Minnesota law. The state believed GSK was violating Minnesota antitrust law by conspiring with other pharmaceutical companies to prevent the sale of prescription drugs to Canadian pharmacies, which sold the drugs to Minnesota purchasers. The state's CID requested that GSK produce information, including documents, relating to both its sale of drugs to Canadian pharmacies and its communications with other pharmaceutical manufacturers, lobbyists, and trade associations regarding importation of drugs from Canada.

Before GSK produced any documents, GSK and the state entered into a confidentiality agreement. The agreement permitted GSK to designate any produced documents as confidential if there was a legal basis that made confidentiality appropriate. For example, any documents that could be subject to a protective order under Minn. R. Civ. P. 26.03 could be designated as confidential. By the terms of the agreement, the state could use the documents designated as confidential for investigation or litigation purposes but could not disclose the documents. The agree-

ment provided that the state could challenge the confidential designation of documents and allowed GSK an opportunity to move the district court to resolve the dispute over confidentiality. The agreement also provided that if the state commenced litigation against GSK, the agreement remained in effect until the court modified, terminated, or superseded it.

Following execution of the confidentiality agreement, GSK partially complied with the state's CID but continued to withhold some of the requested documents. The state filed a motion in Hennepin County District Court to compel the production of the remaining documents requested in the CID. Before the court ruled on the state's motion, GSK filed a motion for a protective order, requesting that the state be prohibited from using the disputed documents outside of the investigation and litigation context. The district court granted the state's motion to compel but denied GSK's motion for the protective order.

GSK continued to withhold a subset of the requested documents, arguing that they were protected from disclosure under the First Amendment. In response, the state filed a second motion to compel production. The parties subsequently agreed that GSK would produce all but 120 of the over 1,000 withheld documents, subject to a protective order. The district court granted a protective order, using language closely aligned with the parties' earlier confidentiality agreement. The protective order also stated that confidential docu-

ments filed with the court in the investigatory process or any resulting litigation must be filed under seal, pending further order from the court. The district court then conducted an in camera review of the remaining 120 withheld documents. Following review, the court required GSK to produce four of the documents and portions of a fifth document to the state, and GSK complied. The remaining undisclosed documents are not at issue in this case.

Pursuant to the terms of the confidentiality agreement and protective order, GSK designated many of the documents it disclosed to the state as confidential. The state disagreed with the confidential designation on some of those documents and consequently filed a motion in Hennepin County District Court challenging the confidentiality designation on 44 of the documents.[1] The state argued that the disputed documents were not confidential under the parties' confidentiality agreement or protective order because they did not meet the applicable legal standards for confidentiality under the Minnesota Government Data Practices Act (MGDPA)[2] or Minn. R. Civ. P. 26.03. Therefore, the state argued that the disputed documents should be available for release to the public.

Before the district court ruled on the state's motion, the state provided the court with a copy of a complaint to be filed under seal against GSK in Ramsey County District Court, attaching many of the disputed documents to the complaint.[3] Less

---

1. While the state's motion challenged the confidentiality of 44 documents, both parties have asserted in their briefs to this court that 45 documents are at issue. GSK further asserts that it withdrew its objection to six documents and that one more was already publicly available. On the record before us, we cannot determine with certainty how many documents are currently disputed.

2. The MGDPA is codified at Minn.Stat. ch. 13 (2006).

3. The complaint alleged violations of Minnesota antitrust law, consumer fraud, and deceptive trade practices. In March 2006, the Ramsey County District Court denied GSK's motion to dismiss the state's lawsuit. GSK states that it has not yet filed an answer to the state's complaint, by agreement of the parties.

than one week later, the Hennepin County District Court issued an order denying the state's motion for a declaration that the disputed documents are not confidential. The court based its denial on three grounds: (1) under the MGDPA, civil investigative data do not become "inactive" upon commencement of an enforcement action, (2) the disputed documents were correctly designated as "petitioning documents," protected by the First Amendment and subject to a protective order under Minn. R. Civ. P. 26.03, and (3) the parties' confidentiality agreement and the previously issued protective order preclude releasing the disputed documents to the public.

The state both appealed and petitioned for discretionary review of the district court's order to the Minnesota Court of Appeals. The court of appeals dismissed the state's appeal and denied the state's petition for discretionary review. We granted the state's petition for review and held that a district court order in a CID proceeding that finally determines the confidentiality of documents produced may be appealed of right. *In re GlaxoSmithKline plc (GSK I),* 699 N.W.2d 749, 756–57 (Minn.2005).

On remand, the court of appeals reversed the Hennepin County District Court's order that the disputed documents remain confidential. *In re GlaxoSmithKline plc (GSK II),* 713 N.W.2d 48, 57–58 (Minn.App.2006). The court of appeals first concluded that the terms of the confidentiality agreement and the protective order authorize the state to challenge the confidential designation of the disputed documents. *Id.* at 52–54. Second, the court held that the MGDPA, specifically Minn.Stat. § 13.39 (2006), does not prohibit the state from disclosing the disputed documents. *GSK II,* 713 N.W.2d at 54–55. Third, the court held that GSK's asserted

First Amendment rights are not valid bases for a protective order under Minn. R. Civ. P. 26.03. *GSK II,* 713 N.W.2d at 55–57.

GSK asks us to consider three issues on appeal: (1) whether the court of appeals erred in holding that the MGDPA does not protect the disputed documents from being made public; (2) whether the court of appeals erred in holding that the disputed documents may not be the subject of a protective order based on First Amendment rights; and (3) whether the disputed documents represent pretrial discovery, entitled to a presumption of privacy. The state asserts that GSK has no valid argument in this appeal for continued nondisclosure of the disputed documents and consequently asks us to determine whether Minn. R. Civ. P. 26.03(g) protects 13 of the disputed documents from disclosure as "commercial information," which, the state asserts, is GSK's only remaining basis for continued nondisclosure of any of the disputed documents. We address each issue.

I.

■ GSK first argues that the MGDPA protects the disputed documents from disclosure. The MGDPA regulates "the collection, creation, storage, maintenance, dissemination, and access to government data in government entities." Minn.Stat. § 13.01, subd. 3 (2006). The act creates a presumption that government data are public and may be accessed by the public unless access is prohibited by law or a temporary classification of the data. *Id.*

■ Minnesota Statutes § 13.39 is the section of the MGDPA that pertains to civil investigations. Although civil investigative data are classified as confidential under section 13.39, subd. 2(a), subdivision 2(a) and subdivision 3 provide specific circumstances under which civil investigative data may be made public: where a govern-

mental entity determines that disclosure is required for one of three enumerated reasons; where the data are presented in court or made part of a court record; and where a civil investigation becomes inactive. Minn.Stat. § 13.39, subds. 2(a), 3. GSK argues that neither subdivision 2(a) nor subdivision 3 of section 13.39 permits release of the disputed documents to the public in this case. We review questions of statutory interpretation de novo. *Hyatt v. Anoka Police Dep't*, 691 N.W.2d 824, 826 (Minn.2005).

A. Minn.Stat. § 13.39, subd. 2(a).

■ Minnesota Statutes § 13.39, subd. 2(a), provides, as relevant here, that "data collected by state agencies * * * as part of an active investigation undertaken for the purpose of commencement or defense of a pending civil legal action, or which are retained in anticipation of a pending civil legal action, are classified as protected nonpublic data," as defined in Minn.Stat. § 13.02, subd. 13 (2006). "Protected nonpublic data" is defined as information made "not public" by statute or federal law. Minn.Stat. § 13.02, subd. 13.[4] But Minn.Stat. § 13.39, subd. 2(a), also provides that a state agency may make protected nonpublic data accessible to the public if it determines that public access will "aid the law enforcement process, promote public health or safety or dispel widespread rumor or unrest." The state

argued to the district court that this language delegates sole authority to the governmental agency conducting the civil investigation to determine if one or more conditions are met, allowing the state to release protected nonpublic data in the civil investigative context to the public without judicial review. The district court disagreed. The court of appeals concluded that the governmental entity conducting the civil investigation has discretion to determine when one of the three conditions enumerated in subdivision 2(a) is met and has the authority to release the documents after making that determination. *GSK II*, 713 N.W.2d at 54–55.

GSK argues that the district court has authority to review the state's determination that one or more of the enumerated conditions are met under subdivision 2(a). GSK asserts that none of the conditions apply in this case and therefore contends that the disputed documents may not be made accessible to the public under subdivision 2(a). But the parties here entered into a confidentiality agreement, which in turn formed the basis of a protective order, and based on our understanding of the agreement and order, we do not reach the legal question of whether subdivision 2(a) permits judicial review of the state's determination that one or more of the conditions justifying public access to protected nonpublic data are met.

---

4. Subdivision 13 of section 13.02 also defines protected nonpublic data as data "not accessible to the subject of the data." This language caused the court of appeals to conclude that the disputed documents were not protected nonpublic data because GSK provided them to the state and thus, the subject of the data "obviously had access to them." *GSK II*, 713 N.W.2d at 54. But such a construction conflicts with the language of Minn.Stat. § 13.39, subd. 2(a), which classifies civil investigative data as protected nonpublic data. We addressed this statutory conflict in *Westrom v.*

*Minnesota Department of Labor & Industry,* where we determined that section 13.39, subd. 2, is a special provision because it addresses only the subject of civil investigative data, and it prevails over the definition in section 13.02, subd. 13, which provides the general definitions that are applicable in all other circumstances. 686 N.W.2d 27, 36 (Minn.2004) (citing Minn.Stat. § 645.26, subd. 1 (2006)). Therefore, civil investigative data are protected nonpublic data even if provided by the subject of the data.

■ Unless an agreement is ambiguous, we determine the parties' intent from the language used. *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 271 (Minn.2004). The terms of the parties' agreement and order permitted GSK to designate any documents it produced to the state as confidential, if GSK had a legal basis for making such a designation. The state agreed to use those designated documents only for investigation and litigation purposes. But the agreement and order permitted the state to object to any document's confidential designation and disclose the document, unless GSK sought by motion, a judicial determination of whether there was a legal basis for designating the document confidential. In seeking a judicial determination under the foregoing terms, GSK asserted that the MGDPA is a legal basis for the disputed documents' confidentiality.

Absent the agreement and order, the civil investigative data that GSK provided to the state were already protected nonpublic data, or confidential, under subdivision 2(a). The terms of the agreement and order provide additional protection for the documents. If the state has discretion to release the documents under subdivision 2(a), as the state argues, the provisions of the confidentiality agreement and protective order are largely meaningless, and the provisions that grant the district court authority to determine whether the documents are properly designated as confidential are nullified.

We conclude that the confidentiality agreement and protective order limit whatever discretion the state may have had under subdivision 2(a) to disseminate the disputed documents to the public. But because the agreement and order vest authority in the court to resolve disputes regarding the confidential status of documents, on remand, the district court should consider whether any of the three conditions enumerated in subdivision 2(a) apply.[5]

### B. Minn.Stat. § 13.39, subd. 3.

■ Minnesota Statutes § 13.39, subd. 3 (2006), provides that inactive civil investigative data are public, subject to limited exceptions. Civil investigative data become inactive if the government decides not to pursue a civil action, the time to file a civil action has expired, or the rights of appeal of either party in the civil action have been exhausted or expired. *Id.* The state does not argue that the investigative data are inactive but instead draws our attention to a provision in subdivision 3, which states: "Any civil investigative data presented as evidence in court or *made part of a court record* shall be public." (Emphasis added.) GSK argues that even though the state filed its complaint in Ramsey County District Court with many of the disputed documents attached, the "court record" reference in the statute does not encompass documents attached to a complaint. The court of appeals concluded that under subdivision 3, once the state filed its complaint in Ramsey County District Court, the complaint became a "court record," including the disputed documents attached to the complaint as exhibits. *GSK II,* 713 N.W.2d at 55.

We agree that GSK's civil investigative data became part of a court record when the disputed documents were attached to a complaint and filed with the district court. GSK encourages us to adopt the approach

---

5. In its order, the district court rejected the state's argument under subdivision 2(a) of section 13.39 without providing any analysis of whether any of the three conditions applied. Because we are unable to determine whether the court properly exercised its discretion on this record, we remand the issue so that it may make explicit findings.

of several federal circuit courts by determining that documents and other evidence do not become part of a court or judicial record until they are used to determine a party's substantive rights. *See, e.g., In re Boston Herald, Inc.,* 321 F.3d 174, 189 (1st Cir.2003) ("[T]his court has often used a definition of a 'judicial record' which refers to 'materials on which a court relies in determining the litigants' substantive rights.' ") (citations omitted). But none of the cases GSK cites explicitly exclude complaint allegations and exhibits from their definitions of court record. Furthermore, many of those cases contemplate a common law presumption of public access. *See, e.g., id.* In Minnesota, the legislative scheme, through the MGDPA, and our court rules govern when civil investigative data and court records may be made public.

■■■ Under the MGDPA, civil investigative data are private until the investigation is no longer active, the data are presented as evidence in court, or the data are made part of a judicial record. Minn.Stat. § 13.39, subd. 3. Any investigative data that are not filed with the court remain protected nonpublic data until the investigation becomes inactive, which occurs when the state agency either decides not to pursue a civil action or the time to file a complaint or an appeal expires. *Id.* But once data are filed with the court, any protection for the documents must come from the court. Minn.Stat. § 13.90 (2006) ("The judiciary is not governed by this chapter. Access to data of the judiciary is governed by rules adopted by the Supreme Court.").

Once documents are filed with the court, public access is governed by the Minnesota Rules of Public Access to Records of the Judicial Branch. These rules define "records" broadly, to include "any recorded information that is collected, created, re-ceived, maintained, or disseminated by a court or court administrator, regardless of physical form or method of storage." Minn. R. Pub. Access to Recs. of Jud. Branch 3, subd. 5. The public is granted access to all case records, except for the limited exceptions enumerated in Rule 4, which includes court rules and orders. Minn. R. Pub. Access to Recs. of Jud. Branch 4, subd. 1. Access to any case records may be restricted, as provided for by applicable court rules. Minn. R. Pub. Access to Recs. of Jud. Branch 4, subd. 2. We note that a protective order is one method by which a court may restrict access to records that would otherwise be available to the public.

The state cites *Westrom v. Minnesota Department of Labor & Industry,* 686 N.W.2d 27 (Minn.2004), to support the proposition that civil investigative data lose confidential status upon the filing of pleadings in district court. In *Westrom,* we assumed that after a civil investigation, documents attached to a petition in an administrative proceeding become public. *Id.* at 36–37. The respondents in *Westrom* argued that the Minnesota Department of Labor and Industry (DOLI) impermissibly released documents to the public that were "protected nonpublic data," as civil investigative data under the MGDPA. *Westrom,* 686 N.W.2d at 32. We affirmed the court of appeals' reversal of the district court's grant of summary judgment to DOLI because there was a factual dispute as to whether or not DOLI had commenced a contested case proceeding prior to the release of the documents to the public. *Id.* at 37. The respondents conceded that if DOLI had filed its petition prior to releasing the documents, the documents would have been part of the record in an administrative contested case proceeding and would consequently have become public documents, and we did not reject the re-

spondents' concession. *Id.* at 36. Although not a holding, our assumption in *Westrom* is consistent with our conclusion here.

■ We conclude that under Minn.Stat. § 13.39, subd. 3, civil investigative data attached to a complaint become part of a "court record," and the MGDPA no longer provides a basis for maintaining the confidential status of such data. We affirm the court of appeals' reversal of the district court on this issue. Because we determine that subdivision 3 does not provide a basis for continued nondisclosure of the disputed documents attached to the state's complaint, on remand, under the MGDPA, the district court must decide whether the disputed documents that were not attached to the state's complaint meet any of the conditions enumerated in Minn.Stat. § 13.39, subd. 2(a).

## II.

GSK next argues that the court of appeals erred in its conclusion that the documents may not be the subject of a protective order based on a First Amendment association right. GSK argues that First Amendment association rights may form the basis of a protective order under Minn. R. Civ. P. 26.03. We apply de novo review to First Amendment issues. *See Fedziuk v. Comm'r of Pub. Safety,* 696 N.W.2d 340, 344 (Minn.2005) ("We review issues of constitutional interpretation de novo."). Interpretation of our procedural rules pres-

ents questions of law, which we also review de novo. *Rubey v. Vannett,* 714 N.W.2d 417, 421 (Minn.2006).

GSK and amicus curiae Pharmaceutical Research and Manufacturers of America (PhRMA)[6] argue that public disclosure of the disputed documents would chill their First Amendment association rights. GSK asserts that the release of its documents would infringe on its association right because disclosure would chill its ability to communicate openly with other pharmaceutical companies and groups such as PhRMA and chill its ability to implement plans and goals to petition the government, especially pertaining to issues that may be publicly unpopular. The court of appeals concluded that neither GSK nor PhRMA provided any evidence to support a claim that public disclosure of the disputed documents would interfere with their respective association rights. *GSK II,* 713 N.W.2d at 57.

■ The freedom of association is not enumerated in the U.S. Constitution but is a derivative right, recognized as necessary to make meaningful the enumerated First Amendment rights of speech, press, petition, and assembly.[7] *Metro. Rehab. Servs., Inc. v. Westberg,* 386 N.W.2d 698, 700 (Minn.1986) (citing *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). The U.S. Supreme Court has observed that "[e]ffective advocacy of both public and private points of view, particularly contro-

6. PhRMA describes itself as a "voluntary, nonprofit trade association representing the United States research-based pharmaceutical industry." PhRMA authored 11 of the documents produced by GSK to the state, which the state now seeks to release, and PhRMA argues those documents should remain confidential for the same First Amendment reasons that GSK asserts. PhRMA notes that it is not a named defendant in the antitrust action filed in Ramsey County District Court, and

the state has not sought documents directly from PhRMA.

7. The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

versial ones, is undeniably enhanced by group association." *Patterson*, 357 U.S. at 460, 78 S.Ct. 1163. The Supreme Court also concluded that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

In order to protect the right to associate, courts have recognized that some measure of privacy may be necessary. The Supreme Court stated, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Patterson*, 357 U.S. at 462, 78 S.Ct. 1163; *see also Black Panther Party v. Smith*, 661 F.2d 1243, 1265 (D.C.Cir.1981) ("Privacy is particularly important where the group's cause is unpopular; once the participants lose their anonymity, intimidation and suppression may follow."), *vacated mem. sub nom. Moore v. Black Panther Party*, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982) *and Smith v. Black Panther Party*, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982).[8]

PhRMA expresses concern that the state's release of the disputed documents may chill both its communications with member companies in the pharmaceutical industry and its ability to communicate internally among staff members. The Supreme Court has concluded that First Amendment protection extends not only to individuals, but also to corporations, associations, and unions. *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776, 98 S.Ct. 1407,

55 L.Ed.2d 707 (1978) (discussing a corporation's First Amendment freedom of speech rights). Association rights in particular apply broadly, beyond groups with unpopular views, to "all legitimate organizations." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 555–56, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Courts have recognized that the freedom of association protects organizational interaction, not only with other organizations, but also with respect to an organization's internal interactions and communications. *See, e.g., Fed. Election Comm'n v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C.Cir.1981); *Wyoming v. U.S. Dep't of Agric.*, 239 F.Supp.2d 1219, 1237 (D.Wyo.2002), *vacated as moot*, 414 F.3d 1207 (10th Cir.2005); *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C.2002).

■ Organizations such as GSK and PhRMA are clearly entitled to the First Amendment protection of their association rights, both within their respective organizations and with respect to communications with other organizations. But we have never determined whether an infringement or chill on an association right may form the proper basis for a protective order to guard that right.

Minnesota Rule of Civil Procedure 26.03 provides that "for good cause shown," a district court may make "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" in the discovery context. We stated that Rule 26.03 "gives the trial court broad discretion to fashion protective orders and to order discovery only on specified terms and conditions." *Erickson v. MacArthur*,

---

**8.** *See Wainwright v. Wash. Metro. Area Transit Auth.*, 903 F.Supp. 133, 136 (D.D.C.1995) (noting that *Black Panther Party* was ultimately vacated on mootness grounds but that "the rationale advanced by the D.C. Circuit remains a useful indicator of its views").

414 N.W.2d 406, 409 (Minn.1987). We also note that once documents and other discovery are filed with the court, the court is no longer bound by Minn. R. Civ. P. 26.03, and it has inherent authority to issue orders to protect the confidentiality of documents and other records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (stating that "[e]very court has supervisory power over its own records and files"); *Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W.2d 197, 202–03 (Minn. 1986). In this opinion, we use the term "protective order" to collectively refer to Minn. R. Civ. P. 26.03 during pretrial discovery and the court's authority to issue orders once documents and other records have been filed with the court.

Sound policy reasons exist for issuing orders to protect the association rights of individuals or organizations. For example, a protective order may protect members whose association with an organization might subject them to harassment or intimidation, and a protective order may guard against the unwillingness of potential members to associate with unpopular groups for fear of public disclosure. *See U.S. Dep't of Agric.*, 239 F.Supp.2d at 1238. In certain contexts, the Supreme Court has completely barred disclosure of an organization's membership list, when release might threaten the members' association rights. *See Gibson*, 372 U.S. at 557, 83 S.Ct. 889; *Patterson*, 357 U.S. at 466, 78 S.Ct. 1163.

Where appropriate, courts have permitted discovery of information that affects association rights but have prohibited dissemination of the information beyond the litigation context. *See Marshall v. Bramer*, —— U.S. ——, ——, —— S.Ct. ——, ——, 828 F.2d 355, 360, 140 L.Ed.2d 180 (6th Cir.1987) (concluding that there were strong interests justifying disclosure of Ku Klux Klan membership lists, but "the disclosure itself, under the court's protective orders, [was] not to be public disclosure, but private disclosure for a limited use"); *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 473 (M.D.N.C.2003) (concluding that a chill on First Amendment association rights does not warrant a bar to discovery into relevant matters, but instead warrants an "exercise [of] judicial discretion by providing protection short of suppression"); *see also* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L.Rev. 427, 476 (1991) ("A well-drafted protective order that limits access to and the use and dissemination of the information is the most effective means of preserving an individual's privacy * * * while making it available for legitimate litigation purposes.").

▋ We conclude that it is within the district court's discretion to issue protective orders for the purpose of protecting an individual or organization's association right. Relief may include prohibiting public disclosure of discovered materials that adversely affect the association right. Because this is our first opportunity to discuss protective relief for an asserted chill on an association right, we turn next to the framework that the district court should apply in exercising its discretion. Based on our review of case law from other jurisdictions, we conclude that the district court should use a two-step analysis. First, the court should determine whether a party asserting the need for a protective order has sufficiently established a potential chilling effect on its association right. Second, if the party meets this burden, the court should balance the party's association right against the state's interest in releasing the information to the public. The state must demonstrate a compelling governmental interest in order

to release documents protected by the First Amendment right to association.

### A. Prima Facie Showing of a Chilling Effect on an Association Right.

Courts typically require that a party asserting the need for a protective order first show that its First Amendment association right may be chilled before a protective order may be issued. *See, e.g., U.S. Dept. of Agric.*, 239 F.Supp.2d at 1236–37; *Snedigar v. Hoddersen*, 114 Wash.2d 153, 786 P.2d 781, 783 (1990); *Lassa v. Rongstad*, 294 Wis.2d 187, 718 N.W.2d 673, 689 (2006). In *Patterson*, the Supreme Court concluded that the NAACP had shown that compelled disclosure of its membership list was likely to adversely affect its association right. 357 U.S. at 462–63, 78 S.Ct. 1163. The NAACP showed that on past occasions, the revelation of some members' identities "exposed those members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462, 78 S.Ct. 1163. The Court concluded that compelled disclosure of the NAACP's membership list would likely affect the organization and its members' ability "to pursue their collective effort to foster beliefs," and would also likely "induce members to withdraw," and "dissuade others from joining." *Id.* at 462–63, 78 S.Ct. 1163.

In *Buckley v. Valeo*, the Supreme Court further discussed association rights, this time in the context of required disclosures of financial contributors to political parties. 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Court concluded that before considering a disclosure exemption for a particular party, the party must show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. 612. The Court noted that the showing could include specific evidence of past or present harassment against members due to their associational ties or evidence of harassment against the party itself. *Id.*

Courts have generally followed *Buckley*, requiring that a party asserting the need for protective relief show a reasonable probability of a chill on its First Amendment association right. *See U.S. Dep't of Agric.*, 239 F.Supp.2d at 1237; *Lassa*, 718 N.W.2d at 689; *see also Black Panther Party*, 661 F.2d at 1268 (requiring a showing of "some probability"); *Snedigar*, 786 P.2d at 783 (same). The chilling effect may be demonstrated by the potential for the withdrawal of active members or the dissuasion of prospective members from joining because of a fear that exposure of their beliefs will result in threats, harassment, or reprisal, which may not only affect physical well-being, but also political activities or economic interests.[9] *See*

---

**9.** The court of appeals stated that "associating purely for financial gain does not come under the umbrella of First Amendment protection." *GSK II*, 713 N.W.2d at 57 (citing *Westberg*, 386 N.W.2d at 700). Our statement in *Westberg* cited by the court of appeals was made to distinguish association for the purpose "of expressing and advancing ideas and beliefs," which we noted is constitutionally protected, from association for the "sole purpose" of "financial gain," which we noted is not protected under the First Amendment. *Westberg*, 386 N.W.2d at 700. But the distinction we

drew in *Westberg* does not mean that protected First Amendment activity that is, association for the purpose of expressing and advancing ideas and beliefs, loses its protected status if economic gain is the ultimate intended result of that association. *See, e.g., Roberts*, 468 U.S. at 622, 104 S.Ct. 3244 ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, *economic*, educational, religious, and cultural ends.") (emphasis added).

*Brock v. Local 375, Plumbers Int'l Union,* 860 F.2d 346, 349–50 (9th Cir.1988); *U.S. Dep't of Agric.,* 239 F.Supp.2d at 1237.

■ The evidentiary showing required to demonstrate a reasonable probability of a chill on an association right is more than subjective assertions of a fear of reprisal. *See McLaughlin v. Serv. Employees Union, AFL–CIO, Local 280,* 880 F.2d 170, 175 (9th Cir.1989) ("Bare allegations of possible first amendment violations are insufficient to justify judicial intervention into a pending investigation."); *Duke Energy Corp.,* 218 F.R.D. at 473 (concluding that organization's "self-serving declarations" were conclusory in nature and showed no evidence that current members might withdraw). But a party need not prove to a certainty that its First Amendment rights will be chilled. *Black Panther Party,* 661 F.2d at 1267–68; *Snedigar,* 786 P.2d at 783. Instead, the party asserting the right must demonstrate "objective and articulable" facts that disclosure of information may chill association rights. *See McLaughlin,* 880 F.2d at 175; *Lassa,* 718 N.W.2d at 690. To illustrate, "specific evidence of past or present harassment of members due to their associational ties" or "harassment directed against the organization itself" demonstrate a reasonable probability of a chill on association rights. *Buckley,* 424 U.S. at 74, 96 S.Ct. 612.

■ We conclude, in the context of this case, that before a protective order may be issued to prevent disclosure of documents or materials to prevent a chilling effect on a party's association right, a party must make a prima facie showing by demon-strating a reasonable probability that the disclosure will cause active members to withdraw or dissuade others from joining because of an objective and articulable fear of threats, harassment, or reprisal to the individual or organization.

B. Balancing the Association Right Against the State's Interest in Disclosure.

■ If a party makes a successful prima facie showing, the district court must balance the party's association right against the state's interest in disclosing the information. Balancing tests are often utilized to protect a party's First Amendment association right. *See, e.g., Black Panther Party,* 661 F.2d at 1266 ("[T]he plaintiff's First Amendment claim should be measured against the defendant's need for the information sought."); *U.S. Dep't of Agric.,* 239 F.Supp.2d at 1241. The state must demonstrate a compelling governmental interest in order to justify chilling a party's association right through disclosing information to the public. *Patterson,* 357 U.S. at 463, 78 S.Ct. 1163; *Brock,* 860 F.2d at 350; *U.S. Dep't of Agric.,* 239 F.Supp.2d at 1241. In conducting the balancing analysis, the district court should consider both the competing interests of the parties and the stage of litigation at which public disclosure is sought.[10]

■ The factors used by the district court in determining the competing interests of the parties will vary in each case. For the party asserting a chill on its association right, once it has established a

---

**10.** It is worth noting that the cases cited all required the government to demonstrate a compelling governmental interest in order to *gain access* to information that implicated a party's association right. Because in this case the state already has access to the disputed documents to use in litigation and only seeks to share information from those documents with the public, we conclude that the state's burden in demonstrating the need to release that information to the public should be at least equivalent to the standard other courts have used to compel discovery.

prima facie showing of potential harm in the first step of the analysis, the strength of that harm is relevant in the second step of the balancing test. The argument against disclosure will "ordinarily grow stronger as the danger to rights of * * * association increases." *Black Panther Party*, 661 F.2d at 1267. The district court should also consider that discovery is intended primarily to assist in preparation for trial or settlement, not necessarily for public education. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). We also note that in most of the cases where courts have protected association rights, it is the identity of members with which the court was concerned and not necessarily the content of documents, for which protection is sought in this case. The district court should consider whether parties are sufficiently protected by having their identities redacted in documents that could otherwise be made public, rather than withholding documents in their entirety.

The party's association right is then weighed against the state's interest in disclosing the information to the public. For example, we noted that in order to make effective the attorney general's statutory duty to enforce antitrust laws, "such enforcement usually must be done publicly, for educational purposes and to deter similar conduct by others." *GSK I*, 699 N.W.2d at 755.

■ In assessing the competing interests of the parties and disclosure, the district court should consider the stage in litigation at which public disclosure is sought. In *Seattle Times*, the Supreme Court noted that "[m]uch of the information that surfaces during pretrial discovery

may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." 467 U.S. at 33, 104 S.Ct. 2199. We agree that materials and information generated during pretrial discovery are often not appropriate for public disclosure. A contrary rule would undermine our liberal discovery policies by encouraging parties to challenge discovery requests that are broader than may be absolutely necessary for litigation. *See* Minn R. Civ. P. 26.02(a) (stating that parties may obtain discovery for any matter relevant to a claim or defense and defining "relevant" as anything reasonably calculated to lead to admissible evidence). Therefore, the district court should evaluate the state's asserted compelling governmental interest in releasing pretrial discovery materials that may chill a party's association right with the policy underlying discovery in mind.[11]

But later in litigation, the privacy interest surrounding pretrial discovery is more likely to yield to the common law presumption of access. *See Minneapolis Star & Tribune Co.*, 392 N.W.2d at 202. As noted above, the Minnesota Rules of Public Access to Records of the Judicial Branch govern judicial records and clarify the common law right of public access in Minnesota. Once the court receives or collects records from parties, the broad rule of public access attaches. *See* Minn. R. Pub. Access to Recs. of Jud. Branch 3, subd. 5; 4, subd. 1

We note that the district court ruled that the disputed documents "were correctly designated as petitioning documents subject to First Amendment privilege" and

---

11. GSK encourages us to adopt a formal "presumption of privacy" for pretrial discovery materials, but we decline to do so at this time. District courts, exercising discretion and with these guidelines now offered, can adequately protect parties' privacy interests and First Amendment rights without a formal presumption of privacy as argued by GSK.

for that reason, among others, would remain confidential. GSK's First Amendment argument in this court is focused primarily on the freedom of association, with only occasional reference to "petitioning" rights. Although, as noted above, the right to petition the government for redress of grievances is one of the express First Amendment rights from which the right to association derives, the court of appeals correctly observed there is no firm body of law establishing a "petitioning privilege" that provides absolute protection for "petitioning" documents from either discovery or public disclosure. *GSK II*, 713 N.W.2d at 56. GSK cites no such authority and, in fact, does not appear to argue for such absolute protection.

The court of appeals correctly explained that federal courts have rejected the notion that the *Noerr–Pennington* doctrine [12] establishes a privilege against discovery of petitioning documents. 713 N.W.2d at 56. GSK apparently does not disagree. The court of appeals further stated that *Noerr–Pennington* would not prevent the disclosure of GSK's documents without a showing that the standard for protection of associational activity is met. 713 N.W.2d at 56. GSK does not appear to contend otherwise. Rather, GSK relies on the *Noerr–Pennington* doctrine only for the propositions that GSK may express its views on legislation and that its petitioning conduct is not illegal under federal or state antitrust law and is therefore not excluded from First Amendment protection. But as far as we can understand, GSK does not

make any argument or cite any authority establishing that documents involved in petitioning activity are entitled to a different level of protection or analysis than is provided under the rubric of GSK's right to association argument. Accordingly, GSK presents no basis for a separate analysis based on a "petitioning privilege," and we decline to engage in a separate analysis.

We reverse the court of appeals' holding that the district court abused its discretion in prohibiting public access to the documents based on GSK and PhRMA's asserted First Amendment rights. We remand to the district court so that it may, consistent with this opinion, determine whether GSK and PhRMA's documents are entitled to a protective order based on First Amendment association rights, as asserted by GSK and PhRMA.[13] Based on the unusual procedural history of this case, with the Hennepin County District Court overseeing the civil investigation and the Ramsey County District Court as the venue in which the state's complaint was filed, we exercise our supervisory authority by remanding both the Hennepin and Ramsey County proceedings exclusively to the Ramsey County District Court, because that is the venue that is home for the underlying litigation. That court already has authority over the documents filed with the complaint, and, if the state so requests, it may also review the remaining disputed documents that were not attached to the complaint. The current record is

---

12. The *Noerr–Pennington* doctrine is based on two U.S. Supreme Court cases holding that concerted activity to petition the government is not an antitrust violation under federal law. *See United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–40, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

13. We note that the district court should determine whether each document the state challenges merits protection based on GSK and PhRMA's First Amendment arguments, and if there are only portions of particular documents that are entitled to protection, the rest of the document should be available for public access.

sufficient for the district court to make its determinations.

## III.

The state asks us to determine whether 13 documents that GSK designated as confidential commercial information, under Minn. R. Civ. P. 26.03(g), should remain confidential. The state did not seek review of this issue in its response to GSK's petition for review but makes the request for the first time in its brief. *See* Minn. R. Civ.App. P. 117, subd. 4 ("Any responding party may, in its response [to a petition for review], also conditionally seek review of additional designated issues not raised by the petition."). But we may take any "action as the interest of justice may require," Minn. R. Civ.App. P. 103.04, and we have the authority to consider issues that were not included in the Rule 117 petition for review. *See Baker v. Ploetz*, 616 N.W.2d 263, 267–68 (Minn.2000) (ordering supplemental briefing of a potentially dispositive issue raised in an amicus brief but not addressed by the parties). We invoke this authority infrequently.

GSK had little opportunity to respond to the state's arguments about these documents due to space limitations in its reply brief. Because the parties' arguments will be better developed in the district court, we decline to determine whether the specified documents qualify as confidential commercial information under Minn. R. Civ. P. 26.03(g).

Affirmed in part, reversed in part, and remanded.